IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RPM LEASING CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-0055-CV-W-ODS |
| ) | |
| COLEMAN POWERMATE, INC., ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pending is Plaintiff's Motion for Summary Judgment. The Court concludes the undisputed facts in the record demonstrate Plaintiff is entitled to judgment on (1) its claims, (2) Defendant's defenses, and (3) all but one of Defendant's counterclaims. Accordingly, the motion (Doc. # 41) is granted in part and denied in part.

## I. BACKGROUND

Most of the facts are not in dispute. On June 1, 2004, the parties entered a Transportation Contract. The contract called for Plaintiff to transport goods and commodities for Defendant at rates established in the contract. Defendant was obligated to make payments within twenty days of receiving each invoice, and invoices were to be billed weekly. The contract's term ran from June 1, 2004, through June 1, 2007.

This case involves invoices for shipments made between July and October (inclusive) of 2005. In that time period Plaintiff transported eight shipments for Defendant, and the invoices totaled $260,358.97. In addition, Plaintiff submitted a hostler invoice (for transporting items from point to point on Defendant's property) in the amount of $1,750.00, so the invoices in question total $262,108.97. All deliveries represented by these invoices were delivered in accordance with the terms of contract: the shipments were made on time and none of the cargo was damaged or missing.

Plaintiff provided timely notice of the invoices, but Defendant has not paid them. Defendant does not deny owing Plaintiff the sum of $260,358.97, but contends this amount is subject to certain offsets.

One of the offsets arises from the alleged loss of two trailers. Plaintiff did not provide the trailers used for the shipments; it provided the trucks and the drivers, but Defendant leased the trailers from a third party. In the Spring of 2005, two trailers (but, apparently, not any cargo) were unaccounted for, obligating Defendant to reimburse the trailers' owner in the amount of $19,553. Nothing in the Record demonstrates whether Plaintiff ever had, much less was the last entity to have, custody or control of the trailers. Similarly, nothing in the Record suggests it did not have custody or control of the trailers.

In approximately August 2005, both Defendant and the FBI were investigating the theft of cargo. Ultimately, one of Defendant's employees – Robert Bristow – was convicted for his involvement and is currently incarcerated. To date, he is the only person to have been arrested or charged for involvement in this scheme. In his deposition, Bristow testified he was a forklift operator, and his role was to load the items to be stolen on a trailer while a manager contacted one of several trucking companies to arrange for the transportation to the destination intended for the stolen items. (It is not clear whether the manager was involved in the plot). Plaintiff was among the transportation companies contacted for this purpose. Bristow Depo. at 18-19.

Defendant offers Bristow's deposition to establish Plaintiff's (or Plaintiff's drivers') knowledge of the thefts. Nothing in the excerpt provided suggests Plaintiff was told – by Bristow or anyone else – that these shipments were illegitimate. In fact, Bristow doubted the Plaintiff or any other trucking company was aware of the theft ring. Bristow Depo. at 21.[1] Plaintiff denies prior knowledge of the theft ring.

---

[1] Bristow testified some of RPM's drivers knew the shipments were illegal, but he is not competent to testify about what someone else knows. He also testified some of the drivers told him they were getting a "cut" from the transaction, but this testimony cannot be used to prove the drivers were getting money because that would constitute hearsay. At best, the fact that some of the drivers made the statement could serve as proof that the driver knew of the shipment's illegal nature, but apart from the ambiguities

"[Defendant] and the FBI each requested that RPM cooperate with the ongoing investigation. [Plaintiff]'s cooperation with the investigation was not satisfactory to [Defendant]. Among other things, [Plaintiff] did not comply with specific requests made by [Defendant] about having contact with [Defendant's] employees during the course of the investigation." Veys Affidavit ¶¶ 5-6. Nothing suggests the FBI was dissatisfied with Plaintiff's cooperation, and nothing suggests Plaintiff withheld information requested by the FBI or otherwise vital to the investigation.

On October 18, 2005, Defendant sent Plaintiff a letter announcing it was terminating the transportation contract. The letter first deemed Plaintiff's response and cooperation during the investigation (which was still ongoing) to be "unacceptable." Specifically, the letter expressed concern over Plaintiff's "conduct toward witnesses who were cooperating with the FBI" and contacts with Defendant's employees. The second reason for termination related to Plaintiff's failure "to locate and account for trailers" allegedly lost while in its control, a reference to the two lost trailers mentioned previously.

Several contract provisions are relevant to this proceeding. Section 5 declares (the emphasis is supplied) the "Carrier shall be liable to the Shipper for actual loss, damage, or injury to the *commodities* measured by the actual replacement cost to Shipper of such commodities" subject to certain monetary limitations.[2] Section 5's final paragraph sets forth the procedure for addressing such losses and requires that "[a]ny claim made by the Shipper . . . be made in writing within thirty days after the date of Shipper notification, setting out details of the commodities in respect of which a claim is made including but not limited to a description of the nature of the commodities . . . ." Section 6 sets forth the parties' rights and abilities to terminate the contract for cause; Defendant had such a right only if Plaintiff was "in substantial default of its obligations

---

in Bristow's testimony there remains nothing to demonstrate Plaintiff's knowledge of or complicity in the unlawful scheme. Bristow Dep. at 20-21.

[2]Because this section applies to lost or damaged commodities, it does not apply to the lost trailers – assuming the obligation to pay for lost trailers arises from the contract in the first place.

3

Case 4:06-cv-00055-ODS   Document 46   Filed 10/18/07   Page 3 of 10

under this contract and if any such default shall continue for a period of ten (10) days after receipt of written notice of such default . . . ." Finally, according to Section 11, any other termination could occur with thirty days written notice, but the cancellation fees in Schedule A would be triggered.

Plaintiff seeks a judgment awarding it (1) the unpaid invoices, (2) the cancellation fees in Schedule A, and (3) prejudgment interest. Plaintiff also asks (both explicitly and implicitly) for a judgment in its favor on Defendant's defenses and counterclaims. As stated earlier, Defendant does not dispute its obligations with respect to the unpaid invoices, but contends (1) the cancellation fees in Schedule A cannot be imposed, (2) prejudgment interest is inappropriate, and (3) a judgment cannot be entered until its counterclaims are adjudicated.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

4

## A. The Unpaid Invoices

The uncontradicted evidence in the Record demonstrates Defendant owes Plaintiff $262,108.97. As discussed more fully below, the Court rejects Defendant's arguments that such a determination is premature in light of its defenses and counterclaims, but for other reasons a judgment will be withheld.

## B. The Cancellation Charges

Defendant contends it is not liable for the cancellation charges because (1) the contract's provision for such charges is unenforceable because it is vague and (2) it terminated the contract because Plaintiff breached the contract first or otherwise terminated the contract for cause. The Court disagrees with both arguments.

### *1. Ambiguity*

Defendant contends there is a conflict between Section 6 and Section 11 because Section 11 does not purport to have any exceptions and thus would apply to a termination for cause – which conflicts with Section 6. The Court does not discern a conflict. A party may terminate the contract for cause under Section 6, in which case the party need not follow the procedure in Section 11 and need not pay the Cancellation Fees in Schedule A as called for by Section 11. Alternatively, a party may terminate the contract without cause under Section 11, in which case the Cancellation Fees must be paid. The Court discerns no ambiguity or conflict, and holds both provisions may be enforced.[3]

---

[3] Even if Defendant's argument were credited, at best it would only demonstrate an ambiguity in Section 6 – but Defendant did not terminate the contract for cause in accordance with Section 6, so any such ambiguity would be irrelevant to the issues in this case.

5

## 2. Plaintiff's Purported Breach(es)

The Record conclusively establishes Defendant did not provide notice *and* an opportunity to cure as contemplated by Section 6.[4] Defendant presents two arguments. First, it argues that its termination on October 18, 2005, should nonetheless be construed as "with cause" sufficient to excuse the cancellation fees because Plaintiff breached the contract. Alternatively, Defendant contends its performance under the contract – including its obligation to follow Section 6 – was automatically and instantly excused as a matter of law because of Plaintiff's initial breach. Under this view, the October 18 letter was merely a "courtesy" advising Plaintiff that Defendant regarded the contract as terminated by virtue of Plaintiff's prior breach. Both of these arguments fail because the Record conclusively establishes Plaintiff did not breach the contract.

Defendant contends Plaintiff's failure to cooperate with the FBI breached the contract. However, (1) no provision of the contract addressed cooperation with the FBI and (2) there is no evidence of a failure to cooperate. The October 18 letter discusses Defendant's dissatisfaction with Plaintiff's cooperation, but nothing in the record substantiates the FBI's dissatisfaction. Defendant also contends Plaintiff's failure to pay for the lost trailers constitutes a breach of the contract, but it again fails to identify any portion of the contract requiring it to pay for lost trailers. This does not mean Plaintiff is not obligated to pay for trailers it lost; it just means the duty to pay does not arise from the contract.

Defendant insinuates Plaintiff breached the contract in other ways, but these insinuations are unavailing for a variety of reasons. Defendant suggests some shipments (other than the ones represented by the unpaid invoices) were late or had

---

[4]Defendant argues it "complied with [Section] 6 of the contract by providing written notice to Plaintiff that trailers had been lost or unaccounted for," Defendant's Suggestions in Opposition at 8, but (1) Defendant has not pointed to any portion of the Record substantiating this contention and (2) other portions of the Record belie this contention. The October 18 letter cannot satisfy Section 6's requirements because it terminated the contract without providing Plaintiff an opportunity to cure the alleged default.

6

lost or damaged cargo, but Defendant did not make a claim as required under Section 5 of the contract. Having failed to make a claim, Defendant cannot rely upon those incidents to nullify the entire contract. Defendant complains Plaintiff breached Section 8 by failing to maintain insurance that would cover the thefts investigated by the FBI. Section 8 requires "automobile/trucking liability insurance" covering accidents by Plaintiff that occur during transportation; Section 8 does not require insurance that covers theft of cargo. Moreover, Defendant's inability to obtain compensation from any of Plaintiff's insurers stems from Defendant's inability to prove Plaintiff's involvement in the thefts, not from Plaintiff's failure to obtain insurance required by the contract. Defendant also contends Plaintiff has somehow violated Section 7, which requires Plaintiff "to indemnify and hold harmless [Defendant] from any and all expenses, damages, claims, actions and/or causes of action that may arise out of the negligent acts of [Plaintiff] . . . while engaged in the performance of the transportation services contemplated in this contract." Defendant has not identified any negligent acts that occurred while performing the transportation services contemplated by the contract. The theft of cargo would not qualify because (1) they were not Plaintiff's acts, (2) they were not negligent acts, and (3) they did not occur while performing transportation services contemplated by the contract. Moreover, there has been no asserted need to indemnify Defendant as a result of those thefts.

  Finally, Defendant contends Plaintiff breached the contract because some of its drivers were involved in the theft of cargo. An employer is liable for its employees' negligent or wrongful acts only if those acts occurred within and during the scope of employment. Plaintiff cannot be responsible for the thefts because the drivers' involvement in the theft ring – assuming any such involvement existed – was beyond the scope of the drivers' employment. Cf. Herberholt v. dePaul Community Health Ctr, 625 S.W.2d 617, 626 (Mo. 1981). "If . . . the servant or agent does a wrongful act without authority, and not for the purpose of executing the orders or doing the work of his employer, the latter is not responsible therefor." Linam v. Murphy, 232 S.W.2d 937, 941 (Mo. 1950) (quotation omitted); see also Carter v. Willert Home Prods., Inc., 714 S.W.2d 506, 511-12 (Mo. 1986) (en banc) (quoting Haehi v. Wabash R. Co., 24 S.W.

7

737, 740 (Mo. 1893)); Butler v. Circulus, Inc., 557 S.W2d 469, 475 (Mo. Ct. App. 1977). The only evidence in the Record demonstrates participation in the theft ring was not authorized by Plaintiff or undertaken for the purpose of furthering Plaintiff's interests, so Plaintiff is not responsible for these torts.

Defendant exercised its right to terminate the contract pursuant to Section 11. In exercising this right, Defendant is obligated to pay the penalties described therein. Accordingly, Defendant is required to pay Plaintiff $99,996.00 for termination fees.

### C. Prejudgment Interest

Under Missouri law, a creditor is entitled to "prejudgment interest at a rate of nine percent per annum on liquidated claims after demand for payment is made." Nusbaum v. City of Kansas City, 100 S.W.3d 101, 109 (Mo. 2003) (en banc) (citing Mo. Rev. Stat. § 408.020). Defendant does not specifically address Plaintiff's arguments regarding interest, other than to suggest Plaintiff's claims are not liquidated because its counterclaims and corresponding right to "offset" have not been determined.[5] As will be discussed in the next section, the only surviving counterclaim is external to the contract and confers no right to offset. More importantly, denying liability or disputing the amount of indebtedness does not terminate the right to recover interest; the key is the nature of the debt. So long as the debt is contractual in nature, the statute applies. E.g., Jerry Bennett Masonry, Inc. v. Crossland Const. Co., 171 S.W.3d 81, 90 (Mo. Ct. App. 2005).

---

[5]The basis of Defendant's asserted right to withhold payment on an undisputed and liquidated debt because of its belief Plaintiff owes it money on a disputed and liquidated debt has not been explained or established. See Sveum v. J. Mess Plumbing, Inc., 965 S.W.2d 924, 926 (Mo. Ct. App. 1998) ("Setoff is generally founded on a *liquidated* debt . . . ." (quotation omitted; emphasis supplied)). Regardless, the right to assert a counterclaim or setoff (which are essentially the same concept, see Buchweiser v. Estate of Laberer, 695 S.W.2d 125, 129 (Mo. 1985) (en banc)) does not affect Plaintiff's statutory right to prejudgment interest.

8

Each invoice was due to be paid within twenty days; therefore, interest accrues on each invoice commencing on the twentieth day after each invoice was received. In addition, Plaintiff is entitled to recover interest on the cancellation fee, commencing on October 19, 2005. These amounts have not yet been calculated, but a final judgment is not being entered at this time so there is no present urgency to calculate the interest owed.

### D. Defendant's Counterclaims

All of Defendant's counterclaims also served as affirmative defenses. Thus, in finding the affirmative defenses are not supported by the Record, the Court has necessarily concluded the Record will not support the counterclaims. For instance, the Court has concluded uncontroverted evidence in the Record precludes the affirmative defense predicated on the theft of cargo; of necessity, then, the Record also precludes Defendant's counterclaim predicated on the theft of cargo.

There is one exception to this general observation: Defendant's claim that Plaintiff is responsible for two lost trailers. The Court held Plaintiff's obligation to pay Defendant for trailers it allegedly lost did not arise from the contract, so Plaintiff's failure to pay could not be considered a breach of contract. However, the Record does not conclusively establish whether Plaintiff is actually responsible for the loss of the trailers. In fact, the portions of the Record cited by the parties do not address this issue. In the absence of undisputed facts, the Court cannot grant judgment as a matter of law on this counterclaim.

### E. Proceedings From This Point

Two tasks remain: (1) calculate the amount of prejudgment interest due to Plaintiff, and (2) adjudicate Defendant's counterclaim for the lost trailers. The former task can be handled through briefing, but the latter task requires the Court to reset this

case for trial.  Accordingly, a bench trial will commence at 9:00 a.m. on November 20, 2007.  A pretrial conference will take place at 8:30 a.m. on November 20, 2007.

It is the undersigned's practice to refer all cases to a Magistrate Judge for a settlement conference after dispositive motions have been ruled.  Accordingly, the parties will be contacted by the Magistrate Judge randomly selected to conduct the conference.  Parties are required to send representatives with full settlement authority. For Plaintiff, this means someone with authority to dismiss Plaintiff's claims and confess judgment in the full amount sought on the counterclaims; for Defendant, this means someone with authority to dismiss Defendant's counterclaims and confess judgment in the full amount sought by Plaintiff.  This does not mean the authority described must be exercised; the illustrations are only meant to describe the degree of authority that must be possessed by the parties' representatives.

## III.  CONCLUSION

For these reasons, Plaintiff's Motion for Summary Judgment is granted in part and denied in part.  Judgement is entered in Plaintiff's favor on all of its claims and on all of Defendant's counterclaims except for the counterclaim alleging Plaintiff lost trailers.  The total amount owed to Plaintiff requires calculation of the prejudgment interest owed, but the Court prefers to enter a single judgment covering the entire case so there is no need to make the calculation at this time.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: October 18, 2007        UNITED STATES DISTRICT COURT